Robert J. EHRICH and Mary McTiernan, on behalf of their infant daughter, Mary Sonia McTiernan Ehrich, Plaintiffs,

v.

BINGHAMTON CITY SCHOOL DISTRICT, et al., Defendants.

Civ. No. 3:02–CV–62(TJM/GLS).

United States District Court, N.D. New York.

Oct. 15, 2002.

**18**

Robert J. Ehrich, Binghamton, NY, pro se.

Mary McTiernan, Binghamton, NY, pro se.

Office of Robert C. Kilmer, Robert C. Kilmer, Binghamton, NY, for Plaintiff Infant Daughter.

Coughlin, Gerhart Law Firm, Paul J. Sweeney, Binghamton, NY, for Defendants.

### Decision and Order

SHARPE, United States Magistrate Judge.

Pending is the defendants' motion to disqualify Robert C. Kilmer, Esq. ("Kilmer"), attorney for infant plaintiff, Mary Sonia McTiernan Ehrich ("Ehrich"), and to impose sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. For the reasons that follow, Kilmer is disqualified and sanctions are denied.

**1.** The motion also sought dismissal. *See* 28 U.S.C. § 636(b)(1)(A) (district court may not delegate pretrial motions seeking dispositive relief to a magistrate for determination). Familiarity with Judge McAvoy's decision is presumed, and this decision recites only those facts necessary to its conclusions.

**2.** In New York, a FOIL violation is remedied in an Article 78 proceeding. *See N.Y. Pub. Off. Law, § 89(4)(b); see also, generally Barrett v. Morgenthau,* 74 N.Y.2d 907, 548 N.E.2d 1300, 549

### I. *Background*

On June 28, 2002, the Honorable Thomas J. McAvoy, District Court Judge, issued a decision regarding this motion. *Decision & Order ("McAvoy Decision"), Dkt. No. 16.*[1] He observed that the non-dispositive disputes were contingent on an *in camera* review of legal billing records. He then referred that review and the non-dispositive issues to this court. *See 28 U.S.C. § 636(b)(1)(A).*

On January 16, 2002, Ehrich's parents filed a *pro se* action on her behalf and on behalf of themselves. *Compl.; Dkt. No. 1 ("Compl.").* They asserted federal question and pendent state claims against numerous defendants, including, *inter alia,* the Binghamton City School District, Dr. James Lee, Steven Deinhardt, and Andrew Collar (collectively, the "School"). The federal claim alleges that the School discriminated against Ehrich in her efforts to join the varsity golf team. One of the pendent state claims asserts a violation of New York's Freedom of Information Law ("FOIL"). *Compl., ¶¶ 12, 41, 60, 65, 79, 123–125; see also, Freedom of Information Law, N.Y. Pub. Off. Law, §§ 84–90 (McKinney 2001).* The FOIL claim alleges that the School failed to fully comply with an information request and improperly redacted its responses, and that the defendant Kollar produced false responsive documents. *Compl., ¶¶ 41, 60, 65, 79.*[2] Whether or not the FOIL claim ultimately withstands judicial scrutiny is a dispositive decision for Judge McAvoy, not this court. However, the assertion of that claim is critically important to the legal analysis controlling this motion.

After the complaint was filed, Judge McAvoy issued an order informing Ehrich's parents that they could not represent their daughter. Kilmer then filed a notice of ap-

N.Y.S.2d 649 (N.Y.1989); *Capital Newspapers Division of the Hearst Corporation v. Burns,* 67 N.Y.2d 562, 496 N.E.2d 665, 505 N.Y.S.2d 576 (N.Y.1986). New York public agencies may redact exempt information when responding to a FOIL request, but the appropriateness of redaction is also subject to Article 78 review. *See Short v. Board of Managers of the Nassau County Medical Center,* 57 N.Y.2d 399, 442 N.E.2d 1235, 456 N.Y.S.2d 724 (N.Y.1982).

pearance on her behalf. *Dkt. No. 6.* The defendants, represented by Paul J. Sweeney, Esq. ("Sweeney") of Coughlin & Gerhart, L.L.P, then filed this motion to disqualify Kilmer, citing an irreconcilable conflict between Kilmer and the School and Kilmer's access to privileged communications. *See Not. Motion, Sweeney Aff. at ¶ 9; Dkt. No. 7.* Seeking sanctions, Sweeney also asserted that Kilmer was aware of the conflict, and filed his notice of appearance for an "improper purpose, such as to harass or to cause unnecessary delay of needlessness increase in the cost of litigation." (*sic.*) *Id. at ¶ 17.*

The parties agree that Kilmer operated the business Legal Expense Management ("LEM"), the School was a client, and Coughlin & Gerhart has continuously functioned as the School's general counsel.[3] *McAvoy Decision at 3.* Sweeney asserts, and Kilmer concurs, that at least from 1998 to March 2002, Kilmer reviewed the School's legal bills submitted by Coughlin & Gerhart. Kilmer's relationship with the School was ongoing during the events that resulted in Ehrich's complaint. *Not. Motion, Sweeney Aff. at ¶ 9; Dkt. No. 7; Kilmer Aff. at ¶ 3; Dkt. No. 11.* The parties agree that Kilmer provided no other legal services to the School. *McAvoy Decision at 3.*

School Superintendent Lee states that LEM was hired because of Kilmer's representation that the business was, in essence, him, and that as a practicing attorney, he would provide superior auditing expertise. In fact, the School would not have hired LEM if Kilmer had not been an attorney. *Lee Aff. at ¶¶ 3, 6; Dkt. No. 14.* In Lee's opinion, the Coughlin & Gerhart bills reviewed by Kilmer contained "all sorts of confidential information pertaining to services rendered, including reference to the legal advice provided to the school district." *Id. at ¶ 4.* Lee asserts that the School has never consented to Kilmer representing adverse interests nor has it waived the confidentiality of its Coughlin & Gerhart communications by providing bills to Kilmer. *Id. at ¶¶ 5–9.*

Shortly after Kilmer filed his notice of appearance, Sweeney wrote him that his representation of Ehrich was precluded because of his legal work on behalf of the School and because of his access to privileged conversations. *See Not. Motion, Sweeney Aff. at ¶ 10, Ex. C; Dkt. No. 7.* Kilmer called Sweeney and left a message that he would withdraw. *Id. at ¶ 11.* When Kilmer did not withdraw, Sweeney sent another letter stating that he would file a motion to disqualify Kilmer unless he immediately withdrew. *Id. at ¶ 12, Ex. D.* Kilmer then replied, stating that he did not oppose Sweeney's position, that he was seeking substitute counsel, and that he would file the substitution when executed. *Id. at Ex. E.* When no substitution was forthcoming, Sweeney filed this motion. *Dkt. No. 7.*

According to Kilmer, his original agreement to withdraw was never tantamount to concurrence with Coughlin & Gerhart's legal conclusions regarding his representation of the School and his access to privileged communications. *Kilmer Aff., ¶ 5, Dkt. No. 11.* On May 17, Robert Ehrich told Kilmer that he had previously obtained Coughlin & Gerhart's legal bills through a FOIL request. *Id. at ¶ 6.* On the same date, Kilmer wrote Sweeney, and told him that his motion was frivolous since the privileged communications had already been disclosed to his "client."[4] *Id. at ¶ 7, Ex. B.* On May 20, Sweeney wrote and told Kilmer that the School had protected privileged disclosures by supplying redacted bills, and that Kilmer still suffered a conflict because of access to privileged information through his review of unredacted billings and because his client (the School) had not waived any privilege. *Id. at Ex. C.* On May 23, Kilmer again wrote Sweeney, and reiterated that he did not concur with Coughlin & Gerhart's legal conclusions. *Id. at ¶ 8, Ex. D.*

Having conducted an *in camera* review of the legal bills, the court observes that they have been highlighted to clearly delineate those portions redacted in response to the FOIL request. *See Sweeney Aff., ¶ 4; Dkt. No. 22* (accurately logging by date the re-

---

3. LEM was hired by the School to review legal bills and propose ways to reduce legal expenses.

4. Obviously, Robert Ehrich is not Kilmer's client.

dacted entries). Generically, the billing entries clearly reflect the manner in which the School and Coughlin & Gerhart processed the FOIL request, the identity of those with whom the attorneys spoke concerning the FOIL request and other aspects of the federal litigation, and the dates upon which such consultations occurred.[5] Accordingly, the bills reveal more than client identity and fee information. They also reveal details of Coughlin and Gerhart's factual investigation, the motive for the School in seeking legal advice, and the specific nature of the services provided, including services directly related to allegations in the complaint.

In their motions, the parties argue opposite legal conclusions from what are essentially uncontested facts. On the one hand, Coughlin & Gerhart asserts that it is a matter of "black letter law" that Kilmer has been privy to privileged communications, and is representing interests adverse to his former client. *Sweeney Aff. at ¶ 15, Dkt. No. 7.* On the other hand, Kilmer asserts that he has reviewed the unredacted legal bills and discerns nothing that would constitute legal advice.[6] Given their failure to recognize or address potential distinctions between federal and state law, the court fully understands the dichotomy in their respective positions.

## II. *Legal Discussion*

### A. *Privileged Communications*

Although the parties presume, *sub silencio,* that the answer to the privilege issue is identical under New York and federal common law, that conclusion is less than clear.

In New York, privileged matter is statutorily exempt from disclosure upon objection by one entitled to assert the privilege. *N.Y.C.P.L.R. 3101(b) (McKinney, Supp. 2002).* The attorney-client privilege is also codified, and subject to that rule. *N.Y.C.P.L.R. 4503(a) (McKinney 1992).* As relevant, it states:

5. The court adopts a "generic" approach because the materials are filed under seal as potentially privileged matters.

6. He further attacks Coughlin & Gerhart, suggesting ethical violations for having redacted the bills. Mr. Kilmer may wish to review *Short v.*

Unless the client waives the privilege, an attorney ... shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action ...

*Id.*

In New York and under federal common law, retainer and fee agreements are not privileged communications.[7] *Matter of Priest v. Hennessy,* 51 N.Y.2d 62, 431 N.Y.S.2d 511, 409 N.E.2d 983 (N.Y.1980); *In re Shargel,* 742 F.2d 61, 62 (2d Cir.1984). In New York, however, bills detailing an attorney's work on behalf of the client are clearly privileged. In *De La Roche v. De La Roche,* 209 A.D.2d 157, 159, 617 N.Y.S.2d 767, 769 (N.Y.App.Div.1994), the Appellate Division stated:

"[B]ills showing services, conversations, and conferences between counsel and others are protected from disclosure. To allow access to such material would disclose discovery and trial strategy, and reveal the factual investigation and legal work that has been done by [the party's] attorneys."

(*quoting Licensing Corp. v. National Hockey League Players Assn.,* 153 Misc.2d 126, 127–28, 580 N.Y.S.2d 128 (N.Y.Co.Sup.Ct.1992)). New York courts have uniformly adhered to this principle. *Teich v. Teich,* 245 A.D.2d 41, 665 N.Y.S.2d 859 (N.Y.App.Div.1997); *Eisic Trading Corp. v. Somerset Marine, Inc.,* 212 A.D.2d 451, 622 N.Y.S.2d 728 (N.Y.App.Div. 1995); *Orange County Publications, Inc. v. County of Orange,* 168 Misc.2d 346, 637 N.Y.S.2d 596 (Orange Co. Sup.Ct.1995).

The *in camera* review reveals redacted entries concerning the legal services provided the School relative to specific allegations in the complaint, and conferences between counsel and identified representatives of the School, including several who are specific defendants in this litigation. That observation is particularly true of the pendant FOIL

*Board of Managers of the Nassau County Medical Center, Id.* at fn. 2, before pressing his allegations of unethical behavior.

7. There are exceptions, but none applicable here.

claim. Accordingly, such bills are privileged in New York.[8]

■ Turning to federal common law, the court preliminarily notes that differences with New York might appear meaningless in light of the Federal Rules of Evidence. Rule 501 governs privileges, and as pertinent, provides:

> [T]he privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions ... with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness ... shall be determined in accordance with State law.

Rule 501 also applies to all preliminary proceedings. *Fed.R.Evid. 1101(c)*. Thus, the rule facially suggests that federal common law governs the federal claims, and New York law governs the pendant FOIL claim. If true, New York's privilege rule would end the inquiry. However, when a complaint asserts a federal question and is accompanied by pendant state claims, the federal law of privilege applies. *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir.1987); *see also, In re Copper Market Antitrust Litigation*, 200 F.R.D. 213, 217 (S.D.N.Y.2001). Accordingly, the court turns to federal law.

■ Although the application of the privilege is less clear, the court concludes that billing records are also protected by the attorney-client privilege under federal common law. In *Baker v. Dorfman*, 2000 WL 1010285 (S.D.N.Y. July 21, 2000), Judge Cote, applying New York law, appointed a receiver to enforce a malpractice judgment. On appeal, the Second Circuit, *sua sponte*, raised privilege concerns about the terms of the receiver's authority. *Baker v. Dorfman*, 232 F.3d 121 (2d Cir.2000). Citing *De La Roche v. De La Roche*, 209 A.D.2d at 158, 617 N.Y.S.2d 767, the Circuit observed that the District Court's order would violate New York's privilege against the disclosure of detailed legal bills, including those "showing services, conversations, and conferences between counsel and others," and remanded the case to Judge Cote for further consideration. *Id.* at 123. On remand, Judge Cote modified the order to preclude disclosure of "detailed accounts of legal services rendered," citing *Eisic Trading Corp. v. Somerset Marine, Inc.*, 212 A.D.2d 451, 622 N.Y.S.2d 728, 729 (N.Y.App.Div.1995), *De La Roche v. De La Roche*, 209 A.D.2d 157, 617 N.Y.S.2d 767, 769 (N.Y.App.Div.1994), *Licensing Corp. of America v. National Hockey League Players Assn.*, 153 Misc.2d 126, 580 N.Y.S.2d 128, 129 (N.Y.Sup.Ct.1992), and *Elliott Associates, L.P. v. The Republic of Peru*, 176 F.R.D. 93, 97–98 (S.D.N.Y.1997). In *Elliott Associates*, Judge Sweet applied New York law and prevented disclosure of detailed billing records, also citing *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 1995 WL 598971, at *2 (S.D.N.Y. Oct. 11, 1995) and *Riddell Sports, Inc. v. Brooks*, 158 F.R.D. 555, 560 (S.D.N.Y. 1994). *Elliott Associates* at 97–98.

*Riddell* and *Bank Brussels* were separate opinions authored by Magistrate Judge Francis. In *Riddell*, he observed that the distinction between the attorney-client privilege under federal common law and New York law is a difficult question. *Riddell* at 560. Citing the Ninth Circuit as federal common law authority, he held:

---

8. There are other prerequisites to the invocation of the attorney-client privilege. "[T]he privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." *Colton v. United States*, 306 F.2d 633, 637 (2d Cir.1962); *People v. Belge*, 59 A.D.2d 307, 399 N.Y.S.2d 539 (N.Y.App.Div.1977). Kilmer has not argued the other prerequisites, and the court therefore concludes that he concedes them. Thus, for example, he accessed the privileged communications while functioning as an attorney on a related matter (legal auditing), and there was no waiver by the School when disclosing the bills to him.

... [C]orrespondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege.

*Id.* (citing *Clarke v. American Commerce National Bank,* 974 F.2d 127, 129 (9th Cir. 1992)). Analogizing the Ninth Circuit's language to the automatic protection afforded by the New York Supreme Court in *Licensing Corp. of America v. National Hockey League Players Assn.,* he observed that the standards "seem to coincide." *Riddell* at 560. A year later in *Bank Brussels,* Judge Francis cited *Riddell* to preclude disclosure of a billing memorandum. *Bank Brussels* at *2. Although not entirely clear, it appears that Judge Francis applied federal common law to do so.

Other authority in this Circuit and elsewhere supports Judge Francis' observation that federal common law may be less clearly defined than the law of New York. In *Colton v. United States,* 306 F.2d 633 (2d Cir.1962), the Circuit held that an attorney invoking the privilege could be compelled to answer questions concerning the date and general nature of legal services performed. *Id.* at 634, 636. However, the legal services questions were generic, and the Circuit noted that the specifics of the questions were not before it. *Id.* at 636. Citing *Colton* and *J.P. Foley & Co., Inc. v. Vanderbilt,* 65 F.R.D. 523 (S.D.N.Y. 1974), the District Court in *Westhemeco Ltd. v. New Hampshire Insurance Co.,* 82 F.R.D. 702 (S.D.N.Y.1979) held that general inquiry into the nature of legal services did not violate the privilege. *Id.* at 707. In *Westhemeco,* the question related to the purpose for retaining counsel (*Id.* at 707) while in *Foley,* the questions related to attorney-client consultations regarding agreements that were the subject of allegations in the complaint (*Id.* at 525, 527–28). In *Church of Scientology of California v. Cooper,* 90 F.R.D. 442 (S.D.N.Y.1981), the District Court permitted questions concerning generic conversations about specific subjects. *Id.* at 443. In *Nemet v. Hyundai Motor America,* 1989 WL 18728 (E.D.N.Y. Feb. 27, 1989), the District Court authorized disclosure of documents revealing the subject matter of privileged conversations, but which did not reveal the conversations themselves. *Id.* at *2.

Although these decisions render suspect a rigid rule that billing statements are uniformly protected by the attorney-client privilege, none specifically focused on billing records. The court can find no clear Circuit authority that expands the billing record rule beyond client identity and fee payment. In fact, the Circuit has carefully limited the rule to client and fee information in a series of criminal cases. *See In re Grand Jury Subpoena Served Upon Doe,* 759 F.2d 968, 971 fn. 3 (2d Cir.1985) (*Doe I*); *In re Grand Jury Subpoena Served Upon Doe,* 781 F.2d 238, 247–48 (2d Cir.1986) (*Doe II*) (*en banc,* vacating Doe I); *In re Two Grand Jury Subpoenae Duces Tecum Dated Aug. 21, 1985,* 793 F.2d 69, 71–72 (2d Cir.1986); *Vingelli v. United States,* 992 F.2d 449, 451–454 (2d Cir.1993); *Lefcourt v. United States,* 125 F.3d 79, 84–87 (2d Cir.1997).

As they specifically relate to billing records, federal common law decisions outside of this Circuit reflect a standard that mirrors the New York rule. The First and Ninth Circuits have stated that fee statements are privileged when they disclose the nature of the services provided, reveal attorneys' advice or reveal details about the defendants' investigation of their claims. *In re San Juan Dupont Plaza Hotel Fire Litigation,* 111 F.3d 220, 232 fn. 12 (1st Cir.1997)(citing *Ring v. Commercial Union Ins. Co.,* 159 F.R.D. 653, 659–60 (M.D.N.C.1995) and *Colonial Gas Co. v. Aetna Cas. & Sur. Co.,* 144 F.R.D. 600, 607–08 (D.Mass.1992)); *Clarke v. American Commerce National Bank,* 974 F.2d 127, 129 (9th Cir.1992); *In re Grand Jury Witness (Salas and Waxman),* 695 F.2d 359, 361 (9th Cir.1982); *accord C.J. Calamia Construction Company, Inc. v. Ardco/Traverse Lift Company, L.L.C.,* 1998 WL 395130, at *3 (E.D.La., July 14, 1998); *Leach v. Quality Health Services,* 162 F.R.D. 499, 500–01 (E.D.Pa.1995); *United States v. Keystone Sanitation Company, Inc.,* 885 F.Supp. 672, 675 (M.D.Pa.1994); *Pandick v. Rooney,* 1988 WL 61180, at *2 (N.D.Ill., June 3, 1988); *Real v. Continental Group, Inc.,* 116 F.R.D. 211, 213–14 (N.D.Cal.1986).

Although the federal rule is less definitive, the court concludes that attorney billing statements are subject to the attorney-client privilege to the extent that they reveal more than client identity and fee information. Here, the billing records do so, and are protected as attorney-client communications.

### B. *Disqualification*

In this district, ethical standards are governed by the New York State Lawyer's Code of Professional Responsibility as interpreted by the Second Circuit. *L.R. 83.4(j)*. Canon 1 requires that lawyers maintain the integrity of the profession. *See Appendix foll. Judiciary Law, § 860, p. 60 (McKinney, Supp. 2001) ("Code")*. Implementing Canon 1, DR 1–106 states that lawyers who provide indistinguishable legal and nonlegal services are bound by the disciplinary rules. Even where nonlegal services are distinct, lawyers are still bound if the client reasonably believes that the services are subject to the attorney-client relationship. *Code, DR–1–106(1–2), p. 103, 22 NYCRR § 1200.5–b*. Canon 4 mandates that lawyers preserve the confidences of the client. *Code, Canon 4, p. 154*. Confidences specifically include information protected by the attorney-client privilege, and the lawyer is forbidden to either reveal the information or use it to the client's disadvantage. *Code, DR–4–101, p. 157, 22 NYCRR § 1200.19*. Canon 5 requires independent judgment on behalf of a client free from conflicts. *Code, Canon 5, p. 177*. Such conflicts include representing adverse interests of current clients absent full disclosure and consent, or representing interests adverse to former clients in substantially related matters. *Code, DR–105, p. 201, 22 NYCRR § 1200.24; DR–5–108, p. 212, 22 NYCRR § 1200.27*. Finally, Canon 9 requires that lawyers avoid the appearance of impropriety. *Code, Canon 9, p. 258*. The Circuit has cautioned that these rules provide guidance, but should not be applied mechanically. *Armstrong v. McAlpin*, 625 F.2d 433, 446 fn. 26 (1980), *vacated on other grounds sub. nom. McAlpin v. Armstrong*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).

Various federal and New York courts have interpreted these ethical standards.[9] As Canon 1 and DR 1–106 specifically state, there is no difference between legal and non-legal services rendered by an attorney. For purposes of conflict resolution, both are legal services. *NCK Org. Ltd. v. Bregman*, 542 F.2d 128, 133 (2d Cir.1976); *Abbondanza v. Siegel*, 209 A.D.2d 1023, 1024, 619 N.Y.S.2d 896 (N.Y.App.Div.1994); *Marshall v. State of New York Division of State Police*, 952 F.Supp. 103, 108 (N.D.N.Y.1997) (McAvoy, CJ). Thus, not only did Kilmer's auditing business constitute legal work, but the School was reasonable in its belief that his services were subject to the attorney-client relationship. *Code, DR–1–106(1–2), p. 103; 22 NYCRR § 1200.5–b; see also, Lee Aff. at ¶ 4; Dkt. No. 14*. In turn, the School's disclosure of its Coughlin & Gerhart privileged communications to Kilmer required that Kilmer protect those confidences. *Code, DR–4–101, p. 157, 22 NYCRR § 1200.19*.

As to Canons 4 and 5, this Circuit recognizes that "[a]s a matter of professional responsibility, an attorney owes a duty of loyalty to his client ... not to divulge confidential communications ... and not to accept representation of a person whose interests are opposed to the client." *In re Agent Orange Product Liability Litigation*, 800 F.2d 14, 17 (2d Cir.1986). With these ethical considerations in mind, the court turns to the School's disqualification motion.

Preliminarily, the court notes that the Northern District is no stranger to disqualification motions. *See Moss v. Moss Tubes, Inc.*, 1998 WL 641362 (N.D.N.Y., Sept. 9, 1998) (McAvoy, DJ); *Marshall v. State of New York Division of State Police*, 952 F.Supp. 103 (N.D.N.Y.1997) (McAvoy, CJ); *Young v. Central Square Central School District*, 213 F.Supp.2d 202 (N.D.N.Y.2002) (Scullin, CJ); *Trimper v. Terminix International Company*, 82 F.Supp.2d 1 (N.D.N.Y. 2000) (Kahn, DJ); *Ives v. Guilford Mills, Inc.*, 3 F.Supp.2d 191 (N.D.N.Y.1998) (Kahn, DJ); *Schwed v. General Electric Company,*

---

**9.** While New York interpretations constitute persuasive authority, they are not binding if incompatible with federal law and policy. *Grievance*

*Committee for the Southern Dist. of New York v. Simels*, 48 F.3d 640, 645–46 (2d Cir.1995).

990 F.Supp. 113 (N.D.N.Y.1998) (Hurd, MJ, now DJ).

Whether or not disqualification is warranted is subject to the court's discretion. *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990). The exercise of that discretion requires a balancing of various interests, including: assurance that the proceedings are conducted with integrity by counsel acting in accordance with ethical standards; a party's right to representation of her choice; the detrimental effect of separating client and lawyer; the strategic implications of disqualification motions; and, concerns for judicial economy. *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979); *Trimper*, 82 F.Supp.2d at 5–6.

■ The Circuit recognizes that misconduct disputes often arise at the outset of a lawsuit, and has cautioned that not every ethical violation requires disqualification. *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976). Accordingly, it has directed courts to employ a restrained approach, limiting disqualification to situations where continued representation will taint the case. *Bottaro v. Hatton Associates*, 680 F.2d 895, 896 (2d Cir.1982) (citing *Nyquist*, 590 F.2d at 1246). Despite the necessity of discretionary restraint, disqualification is warranted in situations involving conflicts of interests, and those where an attorney is potentially in a position to unfairly advantage his current client through the use of privileged information. *Nyquist* at 1246; *Marshall*, 952 F.Supp. at 107. In fact, the Circuit has stated that the risk of taint "is encountered when an attorney represents one client in a suit against another client, in violation of Canon 5, or might benefit a client in a lawsuit by using confidential information about an adverse party obtained through prior representation of that party, in violation of Canon 4." *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir.1981) (*internal quotations omitted*).

■ The conflict analysis differs depending on whether an attorney is representing interests adverse to a current or former client. A substantial relationship test governs conflicts with former clients. *See Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384,

1386 (2d Cir.1976); *Marshall* at 107; *Moss* at *4. There are three prerequisites to disqualification under the former client rule: (1) the moving party is a former client; (2) there is a substantial relationship between the subject matter of the prior relationship and the current litigation; and (3) the attorney representing the adverse interest is likely to have had access to relevant privileged information during the course of his representation of the former client. *Marshall* at 107. The purpose of the substantial relationship test is to prevent the possibility that the former client's confidences will be used to his disadvantage. *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir.1973).

■ As to current clients, a more stringent rule applies, and adverse representation is per se improper unless the attorney opposing disqualification demonstrates "that there is no actual or apparent conflict in loyalties or diminution in the vigor of . . . representation." *Cinema 5 Ltd.* at 1387; *Ives* at 202. The more stringent per se rule vindicates an entirely different ethical principle than does the substantial relationship test. The propriety of representing interests adverse to a current client "must be measured not so much against the similarities in litigation as against the duty of undivided loyalty which an attorney owes to each of his clients." *Cinerama 5, Ltd.* at 1386.

■ To circumvent the per se rule, an attorney must make full disclosure and obtain the clients' consent. *Code, 5–105(C), 22 NYCRR § 1200.24*. In an oft quoted passage, the Circuit has said:

> Under the Code, the lawyer who would sue his client, asserting in justification the lack of a "substantial relationship" between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed. Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned.

*Cinema 5 Ltd.* at 1386. The burden of proving full disclosure and consent is on the attorney seeking to represent adverse inter-

ests. *Fisons Corp. v. Atochem North America, Inc.,* 1990 WL 180551, at *4 (S.D.N.Y. Nov. 14, 1990).

■ The per se rule applies if an attorney simultaneously represents clients with differing interests even though the representation ceases prior to filing the disqualification motion. *Unified Sewerage Agency of Washington Co., Ore. v. Jelco,* 646 F.2d 1339, 1345 fn. 4 (9th Cir.1981) (citing *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 435 F.Supp. 84, 95 (S.D.N.Y.), *aff'd in part, rev'd in part on other grounds,* 567 F.2d 225 (2d Cir.1977)). The Ninth Circuit observed that if the rule was otherwise, an "attorney could always convert a present client into a 'former client' by choosing when to cease to represent the disfavored client." *Id.* Thus, Judge Kahn has observed, the critical event is when the conflict arose, not when the motion was brought. *Ives* at 202; *see also, Chemical Bank v. Affiliated FM Ins. Co.,* 1994 WL 141951, at *11 (S.D.N.Y. April 20, 1994); *Fisons Corp.* at *3; *but see Hartford Accident & Indemnity Co. v. RJR Nabisco, Inc.,* 721 F.Supp. 534, 540–41 (S.D.N.Y.1989) (declining to apply the current client rule to a relationship that terminated after suit was filed based on the unique circumstances of the case).

■ While it may be true that Kilmer last represented the School in March of this year, it is also true that the facts generating the lawsuit and the conflict arose during his employment. In fact, the complaint itself was filed in January, two months before Kilmer's termination. Furthermore, it is precisely because Kilmer, as the School's LEM attorney, accessed privileged communications concerning this very case that the School has moved to disqualify him. Thus, the per se rule

applies, and Kilmer cannot rebut it by showing that he did not access privileged conversations because the court has already concluded that he did so. Furthermore, while full disclosure is not an issue, it is unquestionable that the School has not consented to Kilmer's representation of Ehrich. Where a clear conflict of interest exists, doubts should "be resolved in favor of disqualification." *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *Cheng v. GAF Corp.,* 631 F.2d 1052, 1059 (2d Cir.1980), *vacated on other grounds and remanded,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981). Accordingly, Kilmer is disqualified.[10]

### C. *Sanctions*

■ The School seeks sanctions against Kilmer for having filed his notice of appearance despite what the School asserts was an obvious conflict. *See Not. Motion, Sweeney Aff.* at ¶ 17.[11] The School cites Rule 11(b)(1) of the Federal Rules of Civil Procedure, arguing that Kilmer's appearance was entered for an improper purpose; namely to harass the School, cause unnecessary delay or increase the cost of litigation.

Rule 11 authorizes sanctions, including costs and attorneys fees, as long as certain procedural requirements are met. Here, those requirements have been satisfied since the School has filed its motion, Kilmer was on notice of the School's conflict position for more than twenty-one days, he failed to move to withdraw, and he had ample opportunity to respond to the motion. *Fed.R.Civ.P. 11(c)(1)(A); see also, Martens v. Thomann,* 273 F.3d 159, 177–78 (2d Cir.2001); *Margo v. Weiss,* 213 F.3d 55, 63 (2d Cir.2000); *Kron v. Moravia Central Sch. Dist.,* 2001 WL 536274,

---

10. Even if the court applied the former client substantial relationship test, it would order Kilmer's disqualification. The School was clearly a client and not only was Kilmer likely to have accessed privileged communications, he did so. Therefore, the only issue is whether there was a substantial relationship between his representation of the School and the current litigation. *See Marshall,* 952 F.Supp. at 107. While at first blush, legal auditing has nothing to do with the vindication of civil rights or a FOIL violation, the necessary relationship is not so restrictive. Instead, the court must focus on the degree of factual and legal overlap to ascertain whether

the former client has likely disclosed confidential information that may be useful to the attorney in representing the new client. *Rosewood Apartments Corp. v. Perpignano,* 2000 WL 145982, at *7–8 (S.D.N.Y. Feb. 7, 2000). Here, the court need engage in no such speculation since privileged information was disclosed, and its use would violate Canon 4. *Glueck,* 653 F.2d at 748.

11. The School also sought dismissal as a sanction, but Judge McAvoy has already denied that aspect of the motion. *McAvoy Decision* at 5–8.

at \*1–2 (N.D.N.Y. May 3, 2001) (Scullin, CJ). Furthermore, having filed a notice of appearance and refusing to withdraw, Kilmer's notice and advocacy constituted conduct encompassed by Rule 11. *O'Brien v. Alexander*, 101 F.3d 1479, 1488–90 (2d Cir.1996).

When deciding whether to sanction or what sanction to impose, the court should view the improper conduct in the context of the following factors: whether it was willful or negligent; whether it reflected a pattern of behavior or an isolated event; whether it infected the whole proceeding or part of it; whether the individual has engaged in similar conduct in the past; whether it was intended to injure; the effect on the litigation in time or expense; whether the responsible person is legally trained; what amount, given the individual's financial resources, is necessary to deter that person from repetition; and, what amount is necessary to deter similar activity by others. *See Fed.R.Civ.P. 11(c)(2); see also, Advisory Committee Notes (U.S.C.A., Supp.2002), cited with approval, Margo* at 64–65. The court must be mindful, however, that the main thrust of Rule 11 sanctions is deterrence. *Salovaara v. Eckert*, 222 F.3d 19, 34 (2d Cir.2000).

The imposition of sanctions is a discretionary decision. *Margo* at 64. That discretion should be exercised with caution, and sanctions imposed only when it is patently clear that one has engaged in improper conduct. *Cerrone v. Cahill*, 2001 WL 1217186, at \*16 (N.D.N.Y., Sept. 28, 2001) (McAvoy, J.). Whether conduct is sanctionable is subject to a test of objective unreasonableness. *Margo* at 65; *see also, Binghamton Masonic Temple, Inc. v. Bares*, 168 F.R.D. 121, 126–127 (N.D.N.Y.1996) (McAvoy, C.J.). When applying this test, courts have adhered to the principle that the questionable conduct must have been totally without merit or utterly lacking in support. *Salovaara* at 34; *Kron* at \*3; *Cerrone* at \*16, 17; *Binghamton Masonic Temple* at 126–27; *Cortez v. CMG Worldwide Inc.*, 962 F.Supp. 308, 313 (N.D.N.Y.1997) (Kahn, J.).

Applying these principles to Kilmer's conduct, the court declines to impose sanctions, but observes that the decision is a close one. First of all, the court must evaluate the conduct and evidence objectively, not subjectively. Subjectively, and in light of the parties' failure to sufficiently analyze the dispute from a federal perspective, it is likely that they relied on their state backgrounds. It is inconceivable from a New York perspective that Kilmer could have disagreed with Coughlin & Gerhart's observations that he had been privy to privileged communications while representing the School and was now undertaking to represent a client with adverse interests in a case where the communications were at the heart of a pendant state claim. As a matter of New York law, Coughlin and Gerhart was correct when it observed that the privilege and conflict answer was a "matter of black letter law." Nonetheless, as should be clear from the breadth and scope of this opinion, the federal answer is anything but a matter of black letter law.

The court must objectively conclude that a reasonable attorney, applying federal law, might have had questions concerning: the extent to which the legal bills reflected disclosure of confidential communications; the extent to which New York law governed the issue in a federal question case in light of Federal Rules of Evidence 501; the extent to which legal auditing services were non-legal services subject to the privilege; and, whether the conflict was subject to the federal per se rule or substantial relationship rule. Although this court seriously doubts that Mr. Kilmer ever recognized those issues given his legal advocacy, his notice of appearance and failure to withdraw were not objectively unreasonable. Furthermore, the court deems Kilmer's conduct, at worse, negligent, and is unaware of similar past conduct. So too, this issue has arisen at the outset of the litigation. While it is unfortunately true that the School has been forced to spend money to litigate, the court declines to impose sanctions.

### III. *Conclusion*

For the reasons stated, it is hereby

**ORDERED** that defendants' motion to disqualify Robert C. Kilmer, Esq. (*Dkt. No. 7*) is hereby **GRANTED**, and it is further

**ORDERED** that defendants' motion to impose sanctions on Robert C. Kilmer, Esq. (*Dkt. No. 7*) is hereby **DENIED**, and it is further

**ORDERED** that the terms and conditions of the February 2, 2002, order of the Honorable Thomas J. McAvoy, District Court Judge, are hereby reinstated; namely:

The parents of Mary Sonia McTiernan Ehrich shall secure counsel for the minor plaintiff and said counsel shall enter an appearance on behalf of the minor plaintiff;

If no counsel has entered an appearance on behalf of Mary Sonia McTiernan Ehrich *within forty-five (45) days* from the filing of this order, or, if Robert J. Ehrich and Mary McTiernan have not filed an amended complaint asserting only their individual claims *within forty-five (45) days* from the filing of this order, the Clerk shall return the file to the Honorable Thomas J. McAvoy who may, if he deems it appropriate, order the Clerk to enter Judgment dismissing this action, **without prejudice**, consistent with his prior February 2, 2002, order, and it is further

**ORDERED** that the Clerk serve a copy of this decision and order on the parties by regular mail.

**IT IS SO ORDERED.**