**THE DIVERSIFIED GROUP, INC., Plaintiff,**

v.

**Paul DAUGERDAS, Defendant.**

**Jenkens & Gilchrist, Plaintiff,**

v.

**The Diversified Group, Inc., Defendant.**

**American Lawyer Media, Inc., Movant–Intervenor.**

Nos. 00 Civ. 0771(SAS), 00 Civ. 6484(SAS).

United States District Court, S.D. New York.

July 30, 2003.

Robert A. Feinberg, Deputy General Counsel, American Lawyer Media, Inc., New York City, for Movant American Lawyer Media.

William B. Wachtel, John W. McConnell, Wachtel & Masyr LLP, New York City, for Respondent DGI.

Ann E. Schofield, McDermott, Will & Emery, New York City, Michael A. Pope, Douglas E. Whitney, McDermott, Will & Emery, Joseph A. Ginsburg, Levin & Ginsburg, Ltd., Chicago, IL, for Respondents Jenkens & Gilchrist and Paul M. Daugerdas.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

American Lawyer Media, Inc. ("ALM"), an integrated media company that focuses on the legal profession, moves for an order: (1) granting it leave to intervene in this now settled action; (2) unsealing documents submitted by the parties in support of and in opposition to a motion for summary judgment ("Summary Judgment Documents"); and (3) identifying other sealed documents. The Diversified Group, Inc. ("DGI"), Paul Daugerdas, and Jenkens & Gilchrist (collectively, "Respondents") seek to preserve the confidentiality of the sealed documents. For the reasons stated below, ALM's motion is granted.

## I. BACKGROUND FACTS

### A. Underlying Action

#### 1. Parties and Claims

The underlying action arose out of a dispute between DGI and its attorney, Paul Daugerdas, in connection with the Option Partnership Strategy ("OPS"), a tax strategy

designed to enable individuals or corporations to achieve tax savings through the use of European-style digital options.[1] *See Diversified*, 139 F.Supp.2d at 447. DGI is a corporation engaged in the business of conceiving and marketing products and methods designed to help taxpayers reduce their corporate and/or personal income taxes. *See id.* at 448. Daugerdas is a tax attorney and Certified Public Accountant whose work primarily involves the rendering of legal opinions on tax strategies for entities such as DGI. *See id.*

In February 2000, DGI sued Daugerdas for breach of fiduciary duty, breach of contract and unjust enrichment, alleging that Daugerdas: (1) disclosed and marketed the OPS to his clients without fairly compensating DGI or obtaining its consent; and (2) failed to refer potential clients who might have benefitted from the OPS to DGI, in breach of a valid contractual understanding between the parties. *See id.*

Daugerdas' employer, the law firm of Jenkens & Gilchrist ("J & G"), brought a separate action for a declaration that: (1) J & G had no obligation, contractual or otherwise, to refer clients to DGI; and (2) the strategy allegedly disclosed to Daugerdas was not confidential. *See id.* The two actions were consolidated for all purposes on September 18, 2000.

## 2. Protective Order

Because confidential attorney-client communications and proprietary information were central to the proceedings in this case, the parties sought a protective order from the Court, pursuant to Federal Rule of Civil Procedure ("Rule") 26(c)(7).[2] Upon a finding of good cause, the Court entered an Order on November 2, 2000, permitting documents that contained confidential information to be filed under seal, provided that "[a]ny party or interested member of the public may request at any time that a 'Confidential' designation be removed from any document or information and, if another objects, seek relief from the Court by motion." 11/2/00 Protective Order ("Protective Order"). Thereafter, twenty-two documents were entered on the docket sheet, each identified only as "SEALED DOCUMENT." [3]

## 3. Summary Judgment

In December 2000, Daugerdas and J & C moved for summary judgment, arguing that no attorney-client relationship existed between Daugerdas and DGI and that no confidential information was misused. On March 22, 2001, the Court issued an opinion and order granting in part and denying in part the motions for summary judgment. *See Diversified*, 139 F.Supp.2d 445. In particular, the Court denied summary judgment on DGI's breach of fiduciary duty claim because a genuine issue of material fact existed as to whether DGI provided Daugerdas with confidential information, thereby giving rise to an attorney-client relationship and concomitant fiduciary duty. *See id.* at 448. The Court granted summary judgment on DGI's breach of contract claim because it was barred by the statute of frauds, *see id.* at 460, and on DGI's unjust enrichment claim because it was duplicative of the breach of fiduciary duty claim, *see id.* at 461. Following the Court's summary judgment ruling, the parties settled the litigation by entering into a stipulation of settlement that expressly con-

---

1. DGI defines the OPS as follows: "The option partnership strategy is a tax-saving strategy wherein a taxpayer purchases and writes options and transfers these option positions to a partnership so as to create substantial increased basis in the partnership interest. As a result of these trades and transfer, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of purchased call options, but is not reduced as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options." *Diversified Group, Inc. v. Daugerdas*, 139 F.Supp.2d 445, 450 (S.D.N.Y.2001).

2. Rule 26(c)(7) provides that a court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way."

3. The sealed documents are docket numbers 20–25, 35–36, 38–39, 41–51 and 56.

tinued the obligation to protect confidential materials.

### B. Proposed Intervenor

ALM owns and publishes twenty-four national and regional legal magazines and newspapers, including The American Lawyer magazine, the New York Law Journal and The National Law Journal. *See* Memorandum of Law in Support of Motion of American Lawyer Media, Inc. for Leave to Intervene and for Unsealing ("ALM Mem.") at 1. These publications report on issues of interest to the legal profession and have a national audience of practitioners, jurists, and academics. *See id.* The publications have a combined circulation of approximately 300,-000. *See id.*

ALM has devoted significant time and resources to the coverage of the tax strategy at issue in the underlying case and the role of attorneys in the creation and dissemination of such strategies. *See, e.g.,* Brenda Sapino Jeffreys, *Bitten By A Cobra? Jenkens & Gilchrist Fights Litigation Over Its Tax Advice,* Texas Lawyer (an ALM publication), Mar. 10, 2003; Nathan Koppel, *Paper Tigers,* The American Lawyer, Nov. 2002; Susan Beck, *Gimme Shelter,* The American Lawyer, Nov. 1999. ALM seeks the release of the Summary Judgment Documents so that it can provide its readers with a complete story regarding tax avoidance methods. *See* ALM Mem. at 1–2.

### II. PROCEDURAL HISTORY

On March 12, 2003, Paul Braverman, a reporter for The American Lawyer magazine, wrote to the Court requesting that the Summary Judgment Documents be unsealed. *See* 3/12/03 Letter to the Court from Braverman. Counsel for Daugerdas, J & G, and DGI opposed the request. *See* 3/26/03 Letter to the Court from Michael A. Pope, counsel for Daugerdas and J & G; 3/26/03 Letter to the Court from William B. Wachtel, counsel for DGI. By order dated March 27, 2003, the Court granted Braverman permission to file a formal motion requesting the unsealing of the documents. On July 28, 2003, oral argument was heard on the motion.

### III. INTERVENTION

ALM may intervene in this action for the "limited purpose of asserting the public's right of access to the sealed documents." ALM Mem. at 5. It is well-settled that intervention pursuant to Rule 24(b) is the proper procedure for a third party to seek to modify a protective order in a private suit. *See United States v. Alex Brown & Sons, Inc.,* 169 F.R.D. 532, 537 (S.D.N.Y. 1996) ("[I]ntervention under [R]ule 24 is the proper mechanism for a non-party to seek modification of a protective order and thus to gain access to information generated through judicial proceedings."), *aff'd sub nom., United States v. Bleznak,* 153 F.3d 16 (2d Cir. 1998); *Martindell v. International Tel. & Tel. Corp.,* 594 F.2d 291, 294 (2d Cir.1979) (stating that the Government should have sought intervention under Rule 24 in order to seek modification of protective order); *see also Beckman Indus., Inc. v. International Ins. Co.,* 966 F.2d 470, 473 (9th Cir.1992) (acknowledging that it is widely recognized among the circuits that Rule 24(b) intervention is the proper method for non-parties to challenge protective orders). Permissive intervention, however, is within the discretion of the district court. *See H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,* 797 F.2d 85, 89 (2d Cir.1986) (citation omitted).

Rule 24(b)(2) states that "[i]n exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Additional relevant factors "include the nature and extent of the intervenors' interests," the degree to which those interests are "adequately represented by other parties," and "whether parties seeking intervention will significantly contribute to [the] full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *H.L. Hayden,* 797 F.2d at 89 (citing *Spangler v. Pasadena City Bd. of Educ.,* 552 F.2d 1326, 1329 (9th Cir.1977)).

There is no risk of undue delay or prejudice here because the underlying case

has been closed for almost two years.[4] Moreover, ALM has demonstrated a legitimate interest in disclosure of the documents at issue—*i.e.*, to provide readers with a complete story regarding the development and use of particular tax strategies—and ALM's interest is not represented by the other parties, all of whom seek to maintain the confidentiality of the record. *See, e.g., Kelly v. City of New York*, No. 01 Civ. 8906, 2003 WL 548400 (S.D.N.Y. Feb. 24, 2003) (granting newspaper leave to intervene for purpose of opposing a motion for a protective order); *Universal City Studios, Inc. v. Reimerdes*, No. 00 Civ. 0277, 2000 WL 757822 (S.D.N.Y. June 7, 2000) (same); *Savitt v. Vacco*, Nos. 95 Civ. 1842, 95 Civ. 1853, 1996 WL 663888, at *7 (N.D.N.Y. Nov. 8, 1996) ("The Second Circuit Court of Appeals and its district courts have consistently held that news agencies have standing to challenge protective orders in cases of public interest.") (citing cases). Furthermore, the parties have not expressed any opposition to the requested intervention itself. Thus, ALM's motion to intervene is granted.

## IV. LEGAL STANDARD FOR MODIFICATION OF A PROTECTIVE ORDER

■ Protective orders issued under Rule 26(c) serve "the vital function … of 'secur[ing] the just, speedy, and inexpensive determination' of civil disputes … by encouraging full disclosure of all evidence that might conceivably be relevant." *Martindell*, 594 F.2d at 295 (internal citations omitted). "Where there has been reasonable reliance by a party on a protective order, a district court should not modify the order 'absent a showing of improvidence in the grant of [the] order or some extraordinary circumstance or compelling need.'" *Securities & Exch. Comm'n v. TheStreet.com*, 273 F.3d 222, 229 (2d Cir.2001) (quoting *Martindell*, 594 F.2d at 296); *see also Palmieri v. New York*, 779

F.2d 861, 864–65 (2d Cir.1985). The rationale for *Martindell's* restrictive attitude toward modification of protective orders, is that "[i]f protective orders were easily modified, … parties would be less forthcoming in giving testimony and less willing to settle their disputes." *TheStreet.com*, 273 F.3d at 230.

■ "While *Martindell* established a general and strong presumption *against access* to documents sealed under protective order when there was reasonable reliance upon such an order, [the Second Circuit] held more recently in *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir.1995) (*"Amodeo I"*), that a subspecies of sealed documents in civil cases—so-called 'judicial documents'—deserve a presumption *in favor of access." Id.* at 231 (emphasis in original). "Judicial documents" are " 'item[s] filed [with the court that are] relevant to the performance of the judicial function and useful in the judicial process.'" *Id.* (quoting *Amodeo I*, 44 F.3d at 145); *see also In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d 139, 147 (2d Cir.1987) (citations omitted).

■ When there are objections to the disclosure of "judicial documents," district courts must "determine the weight of the presumption in favor of public access by evaluating 'the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.'" *TheStreet.com*, 273 F.3d at 231 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir.1995) (*"Amodeo II"*)). "Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Amodeo II*, 71 F.3d at 1049.

■ The presumption is given great weight where the requested documents were

---

4. " '[I]ntervention to challenge confidentiality orders may take place long after a case has been terminated.' " *E.E.O.C. v. National Children's Ctr., Inc.*, 146 F.3d 1042, 1047 (D.C.Cir.1998) (quoting *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 779 (3rd Cir.1994)). "Rule 24(b)'s timeliness requirement is to prevent prejudice in the adjudication of the rights of the existing parties, a concern not present when the existing parties have settled their dispute and intervention is for a collateral purpose." *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir.1990) (allowing intervention three years after the case had been settled because intervention "was for the sole purpose of challenging a protective order").

introduced at trial or were otherwise material to a court's disposition of a case on the merits. *See id.* (citing *Joy v. North,* 692 F.2d 880 (2d Cir.) (vacating a protective order entered with respect to a report that was material to the district court's grant of summary judgment), *cert. denied sub nom., Citytrust v. Joy,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983)); *see also FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 408–09 & n. 5 (1st Cir.1987) (favoring public access to documents submitted in connection with a consent decree that were "material and important" to the district court's decision to approve the settlement). "In each of these cases, the strong weight to be accorded the public right of access to judicial documents was largely derived from the role those documents played in determining litigants' substantive rights—conduct at the heart of Article III—and from the need for public monitoring of that conduct." *Amodeo II,* 71 F.3d at 1049.

 "Conversely, the presumption of access to documents that do not serve as the basis for a substantive determination—such as documents submitted on a motion for summary judgment which is denied, thus leaving a decision on the merits for another day—is appreciably weaker." *United States v. Graham,* 257 F.3d 143, 151 (2d Cir.2001) (citing *Amodeo II,* 71 F.3d at 1049). The weakest presumption is given to documents such as preliminary settlement documents, which are not submitted to a court for ratification. *See United States v. Glens Falls Newspapers, Inc.,* 160 F.3d 853, 857 (2d Cir.1998). Such documents "play a 'negligible role' in the trial judge's exercise of Article III judicial power until they are merged into a tentative final agreement for court action, thereby becoming public." *Id.* (quoting *Amodeo II,* 71 F.3d at 1050). Finally, there are certain documents—specifically, those that are passed between the parties in discovery—that "lie entirely beyond the presumption's reach." *Amodeo II,* 71 F.3d at 1050.

 "Discerning the weight of the presumption with respect to judicial documents falling between these extremes on the continuum is a matter of judgment." *Graham,* 257 F.3d at 150. However, district courts should be guided by whether the documents "are usually filed with the court and are generally available." *Amodeo II,* 71 F.3d at 1050.

 After the weight of the presumption is established, district courts must then balance countervailing factors, such as law enforcement concerns, judicial efficiency, and the privacy interests of the parties, against the presumption. *See id.* "The task of the courts is to 'weigh[ ] the interests advanced by the parties in light of the public interest and the duty of the courts.' " *Amodeo I,* 44 F.3d at 146 (quoting *Nixon v. Warner Communications,* 435 U.S. 589, 602, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)).

## V. UNSEALING OF SUMMARY JUDGMENT DOCUMENTS

### A. Presumption of Access

 The first question is whether to apply the presumption in favor of access set forth in the *Amodeo* cases or the presumption against access set forth in *Martindell.* The Summary Judgment Documents are without question "judicial documents." They contain all of the hallmarks of a record relevant to the performance of the judicial function. The documents were filed with the Court, in accordance with Local Rule 6.1, and relied upon by the Court in rendering its opinion on defendants' motions for summary judgment. Thus, the documents were clearly used in the judicial process and are therefore subject to the right of public access.

### B. Weight of Presumption of Access

The next question is what weight to give the presumption of access. The Summary Judgment Documents informed the Court's decision to dismiss two of the claims in the underlying lawsuit—the breach of contract and unjust enrichment claims—and were therefore material to a substantive and dispositive determination on the merits of the case.[5] This adjudication was clearly an exer-

---

**5.** Respondents argue that the presumption in favor of access is "substantially diminished" in this

case because the Court denied summary judgment with respect to one of the claims in the

cise of "Article III judicial power," *TheStreet.com*, 273 F.3d at 231, "the basis of which should, absent exceptional circumstances, be subject to public scrutiny," *Joy*, 692 F.2d at 893.[6] Thus, the documents must be given a strong presumption of public access.

## C. Countervailing Factors

Respondents argue that they and the public have two compelling interests that "far outweigh" the interests asserted by ALM: (1) the just, efficient, and inexpensive resolution of judicial disputes; and (2) the protection of confidential attorney-client communications. Joint Memorandum of Law in Opposition to ALM's Motion for Leave to Intervene and Unseal Court Papers ("Resp. Mem.") at 9.

### 1. Judicial Economy

■ Respondents contend that to allow ALM access to the sealed documents in this case would "substantially undermine the important public interest in judicial efficiency." Resp. Mem. at 16. In particular, Respondents argue that they "reasonably relied on the protective order to navigate discovery issues" and ultimately settle the dispute and that to permit access to confidential information now " 'would unduly interfere with [their] legitimate expectations of confidentiality.' " *Id.* at 15 (quoting *Daniels v. City of New York*, 200 F.R.D. 205, 210 (S.D.N.Y. 2001)).

If protective orders were routinely set aside, the functioning of the courts would be impaired because "parties would resort less often to the judicial system for fear that such orders would be readily set aside in the future." *TheStreet.com*, 273 F.3d at 229–30.

In this case, however, the parties' reliance on the confidentiality afforded by the Protective Order must have been tempered because the Order specifically provides that "[a]ny party or interested member of the public may request at any time that a 'Confidential' designation be removed from any document or information." Protective Order. Thus, although the Protective Order may have facilitated the "just, speedy and inexpensive" resolution of the underlying dispute, Fed. R.Civ.P. 26(c), the parties' alleged reliance on the Order is insufficient to outweigh the strong presumption in favor of public access.

### 2. Attorney–Client Communications

■ Respondents additionally argue that the Summary Judgment Documents are "replete with references to . . . confidential and privileged attorney-client communications" and that "[t]he continued protection of these documents is essential, both because of the paramount value that our legal system places on the attorney-client privilege and the fact that DGI continues to rely upon the protection of the privilege." Resp. Mem. at 9.

■ It is undeniable that the public has a significant interest in preserving the confidentiality of attorney-client communications. "Indeed, this is precisely the kind of countervailing concern that is capable of overriding the general preference for public access to judicial records." *Siedle v. Putnam Invs.*, 147 F.3d 7 (1st Cir.1998) (reversing a district court's decision to unseal privileged documents at the request of a newspaper); *see also Crystal Grower's Corp. v. Dobbins*, 616 F.2d 458, 462 (10th Cir. 1980) (concluding that the public's interest in preserving the attorney-client privilege

---

lawsuit—the breach of fiduciary duty claim, which ultimately was resolved through a private settlement rather than a trial. The fact that the Court did not make a dispositive ruling on one of DGI's claims is immaterial. The Court's decision was based on a review of *all* of the documents. Moreover, to equate the weight of the presumption with the disposition of each particular claim would require the Court to review the documents under varying standards, which would be extremely difficult and a waste of judicial resources.

**6.** It does not matter that the documents are being sought by journalists whose primary goal is not to monitor the conduct of judges but rather to inform readers about various tax avoidance methods. The Second Circuit has clearly stated that the motive of a party seeking access is irrelevant to the determination of the weight to be accorded the presumption of access. *See Amodeo II*, 71 F.3d at 1050 ("Where access is for the purpose of reporting news . . . those interested in monitoring the courts may well learn of, and use, the information whatever the motive of the reporting journalist.").

outweighs the public's more general interest in access to court documents); *Dombrowski v. Bell Atl. Corp.*, 128 F.Supp.2d 216, 219 (E.D.Pa.2000) (finding that the failure to maintain privileged materials under seal would cause "a clearly defined and serious injury not only to the parties seeking closure but also to the public interest which the attorney-client privilege is designed to serve") (internal quotation marks and citation omitted).[7]

Cursory review of the Summary Judgment Documents reveals that they are replete with communications between Daugerdas and DGI. The more difficult question, however, is whether those communications fall within the ambit of the attorney-client privilege.

■■■■■ A claim of attorney-client privilege is recognized under the common law where: (1) legal advice is sought (2) from a professional legal adviser in his capacity as such, (3) the communications are made in confidence and (4) relate to that purpose, and (5) are made or received by the client.[8] *See United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir.1997) (citations omitted). The confidences must constitute information not intended to be disclosed by the attorney.[9] *See United States v. BDO Seidman*, 337 F.3d 802, 810–11 (7th Cir.2003) (citing *United States v. Weger*, 709 F.2d 1151, 1154 (7th Cir.1983) and *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir.1984)). Furthermore, the party asserting the privilege must show that the communications were made for the purpose of obtaining legal advice. *See id.* (citing *In re Grand Jury Proceedings (Thullen)*, 220 F.3d 568, 571 (7th Cir.2000)).

■■■ The parties dispute whether the provision of tax shelter advice by a lawyer is covered by the attorney-client privilege. *See* 7/18/03 Letter to the Court from Robert A. Feinberg, Deputy General Counsel for ALM (arguing that Daugerdas and J & G may have been acting as "businessmen, not attorneys, and the attorney-client privilege therefore may not apply."); 7/21/03 Letter to the Court from William B. Wachtell and Ann E. Schofield, counsel for Respondents (stating that "J & G was acting directly as [DGI's] attorney.").[10] In *Diversified*, I held that "[a]dvice relating to the tax consequences of proposed transactions, when rendered by an attorney, is considered legal advice." 139 F.Supp.2d at 455 (citing *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1037 (2d Cir.1984); *Matter of Federated Dep't Stores, Inc.*, 170 B.R. 331, 354 (S.D.Ohio 1994); *In the Matter of Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir.2000)).

Subsequently, a number of courts have looked at the more narrow question of whether documents that reveal the identities

---

**7.** ALM argues that Respondents have waived the attorney-client privilege by submitting the Summary Judgment Documents to the Court. *See* ALM Mem. at 8 (relying on *Joy*, 692 F.2d at 894, in which the Second Circuit held that defendants cannot simultaneously use the report of a special litigation committee to argue that the lawsuit should be dismissed and refuse to produce the underlying data asserting that it is privileged). ALM's argument is unavailing. *Joy* involved the offensive and selective use of privileged material by the holder of the privilege in order to obtain summary judgment. It did not involve a dispute between an attorney and client in which disclosure of confidential communications was inevitable. In conflicts between a client and former attorney, an attorney may disclose privileged information, but such disclosure must be strictly limited to information "necessary to defend against pending civil or criminal charges" and "should ordinarily be permitted in the course of formal proceedings and under court supervision." *First Fed. Sav. & Loan Assoc. of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 110 F.R.D. 557, 566 (S.D.N.Y.1986) (citing *Meyerhof-*

*er v. Empire Fire & Marine Ins. Co.*, 497 F.2d 1190 (2d Cir.1974)).

**8.** As the parties implicitly acknowledge in their submissions to the Court, New York law controls the modification of the protective order, but Illinois law applies to the analysis of the alleged attorney-client communications. *See Diversified*, 139 F.Supp.2d at 453 (stating that New York's interest in the underlying breach of fiduciary duty claim is outweighed by Illinois' interest in regulating the conduct of its attorneys).

**9.** Confidentiality in the tax context may be waived when communications with a tax adviser ultimately are used to prepare the client's tax return, a non-confidential document. *See United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999) (stating "if the client transmitted the information so that it might be used on the tax return, such a transmission destroys any expectation of confidentiality.").

**10.** Daugerdas and J & G took the opposite position in the underlying lawsuit.

of clients who sought advice regarding tax shelters and subsequently invested in those shelters are privileged attorney-client communications.[11] *See, e.g., BDO Seidman,* 337 F.3d 802; *United States v. Arthur Andersen, L.L.P.,* No. 02 Civ. 6790, 2003 WL 21518562, 273 F.Supp.2d 955 (N.D.Ill. July 2, 2003); *Doe v. Wachovia Corp.,* 268 F.Supp.2d 627 (W.D.N.C.2003). These courts have acknowledged that a client's identity is not generally considered a privileged attorney-client communication, except "where the disclosure of the client's identity would lead ultimately to disclosure of the client's motive for seeking the advice of an attorney," and examined the implications of disclosure in their particular cases. *United States v. BDO Seidman, LLP,* No. 02 Civ. 4822, 2003 WL 932365, at *1 (N.D.Ill. Feb. 5, 2003), *aff'd, BDO Seidman,* 337 F.3d 802. That the attorney-client privilege applies when an attorney provides tax shelter advice is implicit in these decisions, for if it did not apply, district courts would not be required to make specific findings with respect to whether the identities of the individual investors were privileged.

Unlike in the recent spate of cases, the tax advice at issue here was provided by a lawyer directly to the marketer of the tax strategies, rather than to taxpayers. Thus, some of the communications between lawyer and client may be privileged, if there was an attorney-client relationship.

The nature of the relationship between Daugerdas and DGI was not decided in the underlying lawsuit. *See Diversified,* 139 F.Supp.2d at 455 (stating "I cannot conclude as a matter of law that an attorney-client relationship with respect to matters pertaining to the OPS did not exist.") (citation omitted). Because it would be too difficult, time-consuming, and expensive to resolve that issue now, given that the underlying case is closed, I will assume for the purposes of this motion that there was indeed an attorney-client relationship.

Because some of the communications between Daugerdas and DGI contained in the Summary Judgment Documents, or parts of those communications, may be privileged attorney-client communications depending on the context, the record must be unsealed so that those communications can be carefully reviewed.[12] Pursuant to Rule 53, Professor Stephen Saltzburg is hereby appointed as Special Master to quickly—but carefully—examine the Summary Judgment Documents, determine which documents contain privileged attorney-client communications, redact the privileged sections, if any, and provide the Court and the parties with specific findings to support the redactions.[13] *See Amodeo I,* 44 F.3d at 147 ("[I]t is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document."). The cost of the Special Master will be shared equally by ALM, DGI, and Jenkens & Gilchrist.[14]

## VI. IDENTIFICATION OF OTHER SEALED DOCUMENTS

██ ALM additionally requests the identification of the other sealed documents in

11. These cases arose in response to summonses issued by the Internal Revenue Service ("IRS") for information related to interests in potentially abusive tax shelters. Under the IRS regulations, the marketer of a potentially abusive tax shelter is required, inter alia, to maintain a log listing the identities of individual investors in that shelter as well as certain details about their transactions. *See* 26 C.F.R. § 301.6112–1T.

12. ALM additionally moves for the unsealing of the documents under the First Amendment right of public access to judicial documents, which has a more rigorous standard—access can be denied only if the court finds that sealing meets the four-part "compelling interest" test. *See United States v. Doe,* 63 F.3d 121, 128 (2d Cir.1995) (citing *Press–Enterprise Co. v. Superior Court of California,* 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986)). The Second Circuit has not yet recognized a First Amendment right of access to documents filed in civil cases. In any event, even if the right applies in the civil context, access to the Summary Judgment Documents requires a privilege review because the existence of privileged attorney-client communications would constitute a "compelling interest."

13. Such findings provide a basis for review in the event of appeal. *See id.* (citing *Press–Enterprise,* 464 U.S. at 510, 104 S.Ct. 819). The findings may be sealed to the extent that they reveal information that should not be disclosed. *See id.*

14. The parties have consented to this appointment and to the Special Master's fee. His report shall be submitted to the Court and the parties no later than August 6, 2003.

the case so that it "may determine whether to move for their unsealing as well." ALM Mem. at 4, 12. All of the remaining sealed documents are motions, memoranda, and supporting documents relating to a discrete discovery issue. As such, the documents are not judicial documents. *See United States v. Gangi*, No. 97 CR. 1215, 1998 WL 226196, at *2 (S.D.N.Y. May 4, 1998) ("Materials submitted to a court for its consideration of a discovery motion are actually one step further removed from the trial process than the discovery materials themselves, materials that the Supreme Court has said are not subject to the public's right of access.") (internal quotation mark and citation omitted). Thus, if ALM decides to move for their unsealing, the *Martindell* presumption against access would apply.

## VII. CONCLUSION

For the reasons set forth above, ALM's motion to unseal the record in this closed case is granted. The Summary Judgment Documents—documents # 20–25—will be immediately unsealed and provided to the Special Master. Once the redaction is completed, and upon formal Order of this Court, the documents will be made available for public inspection by ALM and any other interested parties. The Clerk of the Court is directed to close this motion.